```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA


DAVID JOSEPH MUNCHINSKI,       )
                Plaintiff,     )
                               )
          vs.                  )    Civil Action No. 03-788
                               )    Judge Alan N. Bloch
                               )    Magistrate Judge Lenihan
WEXFORD HEALTH SERVICES, INC.; )
EUGENE GINCHEREAU, M.D.,       )
Medical Director; PAUL NOEL,   )
M.D., Wexford Regional Medical )
Director for Western           )
Pennsylvania; JOAN DELIE,      )
Correctional Health Care       )
Administrator; NEAL K.         )
MECHLING, Facility Manager     )
SCI-Pittsburgh; and PRISON     )
HEALTH SERVICES INC.,          )
                Defendants.    )
```

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I. RECOMMENDATION

It is respectfully recommended that the Motion for Summary Judgment filed by Defendant Joan Delie (doc. no. 65) be denied and that the Plaintiff's "Counter" Motion for Summary Judgment (doc. no. 74) be denied.

### II. REPORT

Plaintiff, David Joseph Munchinski, a prisoner previously confined at the State Correctional Institution at Pittsburgh, Pennsylvania (SCIP), commenced the present action pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983 against the following Defendants: Wexford Health Sources, Inc. (WHS) (incorrectly identified in the Complaint as Wexford Health Services, Inc.); Eugene Ginchereau, M.D., Medical Director; Paul Noel, M.D.,

Wexford Regional Medical Director for Western Pennsylvania; Joan Delie, Correctional Health Care Administrator; Neal K. Mechling, Facility Manager, SCIP; and Prison Health Services, Inc. (PHS). Plaintiff alleges that Defendants violated his rights as protected by the Eighth and Fourteenth Amendments of the United States Constitution as a result of alleged denial of adequate medical treatment he received while he was confined at SCIP.

### A. Standard of Review

Defendant Joan Delie has filed a motion for summary judgment to which Plaintiff responded with a "counter" motion for summary judgment.  Pursuant to  Fed. Rule Civ. Proc. 56(c), summary judgment may be granted if, drawing all inferences in favor of the non-moving party, the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986) (party can move for summary judgment by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."). The moving party bears the initial burden of identifying evidence that demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the non-moving party must

set forth ". . . specific facts showing that there is a <u>genuine issue for trial</u> . . ." or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. <u>Matsushita Elec. Ind. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986).

### B. Liability under 42 U.S.C. § 1983

Plaintiff asserts liability against Defendants pursuant to 42 U.S.C. § 1983. In order to assert liability under 42 U.S.C. § 1983, a plaintiff must meet two threshold requirements. He must allege: 1) that the alleged misconduct was committed by a person acting under color of state law; and 2) that as a result, he was deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States. <u>Parratt v. Taylor</u>, 451 U.S. 527, 535 (1981), *overruled in part on other grounds*, <u>Daniels v. Williams</u>, 474 U.S. 327, 330-331 (1986).

Plaintiff asserts that Defendants have violated his rights as protected by the Eighth Amendment as applied to the states through the Fourteenth Amendment. In order to make out a prima facie case that a prison official's actions violate the Eighth Amendment's prohibition against cruel and unusual punishment, an inmate must show two elements. First, a prisoner must show that the condition, either alone or in combination with other conditions, deprived him of "the minimal civilized measure of

life's necessities," or at least a "single, identifiable human need." Wilson v. Seiter, 501 U.S. 294 (1991) (citing Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). Second, an inmate must demonstrate deliberate indifference to prison conditions on the part of prison officials. Farmer v. Brennan, 511 U.S. 825, 834 (1994); Wilson, 501 U.S. at 297; Rhodes, 452 U.S. at 347. "[O]nly the unnecessary and wanton infliction of pain implicates the Eighth Amendment. . . . To violate the Cruel and Unusual Punishments Clause, a prison official must have a 'sufficiently culpable state of mind.'" Farmer, 511 U.S. at 834 (quoting Wilson, 501 U.S. at 297).

In the context of a claimed denial of medical treatment, an inmate must show two elements to demonstrate a violation of his rights as protected by the Eighth Amendment: 1) that he was suffering from a "serious" medical need; and 2) that the prison officials were "deliberately indifferent" to the serious medical need. *Id*. The first element requires a plaintiff to demonstrate a medical need that is objectively "sufficiently serious." A medical need is "serious" if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person easily would recognize the necessity for a doctor's attention. Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987), *cert. denied*, 486 U.S. 1006 (1988).

The second element requires a plaintiff to demonstrate that officials subjectively acted with a sufficiently culpable state

of mind.  In this regard, a plaintiff must demonstrate that a defendant's acts constituted "an unnecessary and wanton infliction of pain" or were "repugnant to the conscience of mankind."  Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).  With respect to claims for inadequate medical treatment, defendants may exhibit deliberate indifference by intentionally denying or delaying access to medical care, or by intentionally interfering with the treatment once prescribed.  *Id*.  However, an inadvertent failure to provide adequate medical care does not evidence deliberate indifference.  *Id*.  Furthermore, while an intentional refusal to provide <u>any</u> medical treatment to an inmate suffering from a serious medical need manifests deliberate indifference and is actionable under the Eighth Amendment, the Eighth Amendment does not require that a prisoner receive every medical treatment that he requests or that is available elsewhere.  A disagreement as to the appropriate choice of medical treatment does not give rise to a constitutional violation; the right to be free from cruel and unusual punishment does not include the right to the treatment of one's choice.  Young v. Quinlan, 960 F.2d 351, 358 n.18 (3d Cir. 1992) (an inmate's disagreement with prison personnel over the exercise of medical judgment does not state a claim for relief under section 1983); White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990).  When, however, prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need for such treatment, the constitutional

5

standard of Estelle has been violated.  West v. Keve, 571 F.2d 158, 162 (3d Cir. 1978).

### C. Defendant Delie

With respect to Defendant Delie, health care administrators do not prescribe medications or make decisions regarding the course of treatment prescribed to inmates.  As such, courts generally have found that prison health care administrators did not act with "deliberate indifference" when the prisoner plaintiff is receiving treatment from the prison doctor.  *See, e.g.* Miller v. Hoffman, 1999 WL 415397, *11 (E.D. Pa. June 22, 1999) (collecting cases).  Notwithstanding, health care administrators are not immune from liability; where the facts indicate personal involvement in an inmate's allegedly deficient medical treatment, courts have refused to grant summary judgment in favor of the administrator.  *See, e.g.*, Sappington v. Ulrich, 868 F. Supp. 194 (E.D. Tex. 1994); Kaminsky v. Rosenblum, 737 F. Supp. 1309 (S.D.N.Y. 1990).[1]

The record reveals that there is a question of fact as to whether Defendant Delie acted with deliberate indifference to Plaintiff's medical needs.  Although prison authorities are accorded considerable latitude in the diagnosis and treatment of

---

[1] *See also* Cooper v. Schriro, 189 F.3d 781, 783-784 (8th Cir. 1999) (prisoner's allegations that health care administrator refused him treatment after he filed medical service request regarding painful decayed and cracked teeth stated cause of action for deliberate indifference to serious medical need in violation of Eighth Amendment).

prisoners, implicit in this deference is the assumption that an informed medical judgment has, in fact, been made. Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir.1979). A plaintiff can demonstrate deliberate indifference where prison authorities allow an ineffective course of treatment or refuse to prescribe appropriate treatment or medications. *See* White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990). In addition, a plaintiff can demonstrate deliberate indifference where prison authorities deny reasonable requests for medical treatment and such denial exposes the inmate to undue suffering or the threat of tangible residual injury. Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir.1987), *cert. denied* 486 U.S. 1006 (1988).

Since the Fall of 2001, Plaintiff has sought medical treatment for growing numbness and weakness in his right arm area. He avers that he personally met with Defendant Delie no less than four times between March 4, 2002 and December 23, 2003 seeking appropriate medical treatment for his deteriorating condition. On March 5, 2002, Plaintiff met with Ms. Delie for the first time and she suggested that she, Plaintiff, and Dr. Noel meet to decide upon an appropriate Diagnostic and Treatment Program Plan (DTPP) to address Plaintiff's medical conditions. After this meeting a variety of tests were performed to diagnose the causes of Plaintiff's deteriorating condition and it was determined that an MRI should be performed. On April 23, 2002,

Plaintiff sent an inmate request to Dr. Noel asking to be referred to an Internal Medical Specialist; Dr. Noel never replied to this request.  On June 24, 2002, the pain in Plaintiff's neck/arm area had become unbearable.  On June 25, 2002, Plaintiff sent another request to Dr. Noel complaining that his scheduled MRI had not been performed and that he was in a great deal of pain.  Subsequently, Plaintiff was seen on sick call and the narcotic drug Vicadin was prescribed for the pain. Plaintiff has remained on Vicadin since that time but his dosages frequently have been interrupted due to inadequate followup in reordering his prescriptions.  Also, his dosages have been increased over time due to his worsening condition and he has been supplemented with bedtime dosages of Valium and Pamelor.

By June of 2002, Plaintiff had suffered severe loss of movement in his right arm.  On July 14, 2002, the MRI of Plaintiff's cervical vertebrae previously scheduled by Dr. Noel was performed.  Because Plaintiff became claustrophobic during the examination, he sent a request to Dr. Kerns on July 15, 2002 advising him that he could not submit to another closed MRI and requested that he cancel the brain MRI he had previously scheduled.  The results of the July 14, 2002 MRI showed that Plaintiff suffered from Degenerative Disc Disease (DDD), a herniated disc between vertebrae C2-C3, and a bulging disc between C7-T1. Plaintiff also suffers from osteoarthritis, which has resulted in the development of bone spurs that are impinging the exit nerves on his right side.  After the results of the MRI

8

were returned, they were inadvertently misplaced. On August 20, 2002, Dr. Noel ordered that Plaintiff be examined by a neurosurgeon.

On October 1, 2002, Wexford Health Services, Inc. (WHS) became the new health care provider at SCIP. Michele Hawkins took over as Medical Director and Dr. Noel became the Wexford Regional Medical Director for Western, Pennsylvania. On October 18, 2002, Plaintiff met with Dr. Hawkins who told him that she would order a consultation with a neurosurgeon regarding his neck/arm condition, which continued to worsen. Plaintiff explained that Dr. Noel had ordered the same consult on August 20, 2002 but that it had not been scheduled. On October 31, 2002, Plaintiff was seen by neurosurgeon Dr. Scott Baker who reviewed Plaintiff's x-rays and written MRI report excluding the MRI pictures. Dr. Baker told Plaintiff that surgery on his neck was required to treat his condition and that, without it, Plaintiff's condition could worsen with increasing loss of fine motor functions, possibly increasing to total paralysis, and permanent nerve damage. He also told Plaintiff that he needed to review the MRI tape, which was not included in his records.

On November 3, 2002, Plaintiff sent a request to Ms. Delie asking her to send the MRI tape to Dr. Baker. About a week later, at a subsequent sick call, Plaintiff learned that Dr. Baker no longer worked at WHS. Plaintiff was told that he would see another neurosurgeon soon. On November 19, 2002, based on his 40 percent loss of fine motor skill ability, Plaintiff sent

a request to Dr. Hawkins to see another neurologist. On November 22, 2002, Plaintiff again met with Ms. Delie and discussed a number of items including the frequent interruptions in his pain medication due to the failure of it being timely ordered and the failure to schedule his neurological examination. At that time, Ms. Delie informed Plaintiff that WHS had no neurosurgeon to whom they could refer him. She suggested that they meet with Dr. Hawkins to establish another DTPP. Plaintiff told her that they did that already and he still was not being treated.

On December 20, 2002, Defendant Mechling informed Plaintiff that SCIP was experiencing some problems with scheduling medical appointments due to the transition in health care providers and further advised Plaintiff that he would be seen by a new neurologist on December 30, 2002. On December 30, 2002, Plaintiff was seen by Neurosurgeon David Oliver Smith, M.D. Dr. Smith examined Plaintiff and stated that, while he saw the need for surgery, he wanted Plaintiff to see another neurologist, Dr. Baser, to determine whether his Parkinson's condition was contributing to his disc problems. Consequently, Dr. Smith submitted a referral for Plaintiff to see Dr. Baser. Not until seven months later, on July 29, 2003, was Plaintiff examined by neurologist Susan Baser, M.D. who recommended in writing that an MRI of Plaintiff's thoracic vertebrae be performed in order to accurately diagnose the source of pain and discomfort.

On July 30, 2003, Plaintiff met with Dr. Ginchereau.[2] At that time, Dr. Ginchereau told Plaintiff that he would not approve the requested MRI and, further, that he would refuse to authorize surgery on a thoracic area of the spine. On July 31, 2003, Plaintiff wrote an Inmate's Request to Staff Member Dr. Ginchereau inquiring why he refused to approve the MRI request and would refuse to authorize surgery. On August 13, 2003 Dr. Ginchereau wrote a nearly illegible response indicating that Plaintiff would be re-evaluated by Dr. Smith.

No further action was taken in regards to Plaintiff's degenerative disc condition until almost six months later when he was examined by Dr. Joseph Wapenski, Attachment M, doc. no. 65. Without conducting any medical tests, including the recommended MRI, Dr. Wapenski opined he was "unable to corroborate the presence of a specific radicular pattern" and did not believe Plaintiff had a "specific surgical issue at this point." Notwithstanding, Wapenski's report provides that a second neurological opinion would be beneficial.

On April 25, 2001, Plaintiff was examined by an ENT specialist who recommended nasal surgery to correct a deviated septum. Subsequently, Dr. Noel disapproved this "elective" surgical procedure. Plaintiff grieved this denial at grievance

---

[2] Dr. Ginchereau became the Medical Director at SCIP in March of 2003. Since shortly after becoming the Medical Director, Dr. Ginchereau routinely ordered Plaintiff's narcotic pain medication every seven (7) days but failed to provide any adequate treatment for his condition.

no. 12302 and on May 29, 2002, received a recommendation from the Department of Corrections dated May 22, 2002 approving the surgery. Notwithstanding, surgery was not scheduled. On October 1, 2002, WHS took over as the health care provider at SCIP. Plaintiff made regular inquiries about his approved surgery.

On November 22, 2002, Plaintiff met with Ms. Delie and asked her when his surgery would be scheduled. Ms. Delie stated that she had no knowledge of the DOC approval for surgery. Plaintiff referred her to his medical chart that referred to the May 22, 2002 approval. Ms. Delie was unable to locate the letter and remarked to Plaintiff that sometimes the health care providers kept such papers because not doing elective surgery saved them money. At that time, Plaintiff told Ms. Delie that he would provide her with a copy of the letter and did so about a week later.

On December 9, 2002, was examined by ENT specialist James E. Blaugrund, M.D. who advised Plaintiff that he would schedule his surgery and that he would be inserting stents during the surgical procedure that would be required to be removed within seven to ten days after surgery. Plaintiff's nasal surgery was performed on January 6, 2002 at Mercy Hospital; he was returned to SCIP twenty minutes after regaining consciousness. On January 8, 2003, Plaintiff was seen for a follow-up check of the bleeding by Dr. Swierczewski, who informed him that his nose was healing well. Plaintiff asked him if he could see the stents in his nose and Dr. Swierczewski told him he could not because it was very

swollen but that he should experience major improvement in his breathing by the middle of the following week.  On January 10 or 13, 2002, Plaintiff was seen by another doctor for his second follow up visit, which was similar to his initial follow up.  On January 20, 2003, Plaintiff still was unable to breathe through his nose and saw Dr. Swierczewski passing on the housing unit. Dr. Swierczewski examined his nose with a pen light but could not detect the stents in Plaintiff's nose.

On January 30, 2003, Plaintiff was seen by Dr. Sabo in the Asthma Chronic Care Clinic.  Plaintiff told Dr. Sabo that he still could not breathe through his nose and asked her to check for stents.  Dr. Sabo examined his nose and told him she did not see anything there.  At that point, a nurse named Terry came into the examination room and told them that the stents should have a cord attached to them, which is used to aid in their removal. Plaintiff told Dr. Sabo that he could feel a cord-like protrusion in both nasal passages.  Dr. Sabo told him that she would not re-examine his nose but that he would have to be examined by an ENT specialist.  Nurse Terry made a phone call inquiring whether Plaintiff was scheduled for a follow-up visit with the ENT and was told that Plaintiff was scheduled to see the ENT on January 21, 2003, over a week earlier.  When Plaintiff questioned why he had not been taken for his examination, Nurse Terry called back the person she previously had spoken with and was told that on January 21, 2003, Dr. Waterson, the acting co-medical director,

had approved the follow-up appointment with the ENT specialist and that Plaintiff would see him soon.

On February 3, 2003, Plaintiff received a yellow inmate pass to show at the infirmary to see Nurse Terry at 1300 hours. After about five minutes, Officer Ken Cuprik asked Plaintiff who took him out today. When Plaintiff asked him what he was referring to, Officer Cuprik told him that he had an 0830 appointment with the ENT. Officer Cuprik called "control" and then related to Nurse Terry that Lt. Schott had failed to enter the appointment into the day trip book. Nurse Terry then examined Plaintiff and noted the blue plastic stents attached to the tissue by sutures blocking Plaintiff's nasal passages. Nurse Terry made a phone call and Ms. Delie entered the Triage area and examined Plaintiff's nose to verify that the stents were in place. Plaintiff asked Ms. Delie when he would receive adequate follow up care to have the sutured stents removed and thus enable him usage of his nose. Ms. Delie stated that it was not her fault he did not receive adequate care because his medical chart did not mention the stents being inserted by the surgeon. Plaintiff looked at the paper and pointed to a section which was encircled that read: "Return for follow up in 7-10 days." When this was pointed out to Ms. Delie, she became defensive and said: "But it doesn't say anything about stents and we thought our doctors could take care of the follow up." Plaintiff reminded Ms. Delie that he had been approved for a follow up visit on January 21, 2003. Plaintiff asked Ms. Delie where it would be documented

that stents were inserted during surgery and she replied that such procedure would be noted in the audio tape made during the surgery. Ms. Delie stated that the audio tape typically is transcribed within 72 hours but that she had not reviewed the transcription of Plaintiff's tape. Dr. Sabo then entered the triage area and Ms. Delie asked her to examine Plaintiff's nose. Dr. Sabo reluctantly agreed and the stents were pointed out to her. She said that this was the field of an ENT specialist. Plaintiff again asked Ms. Delie when he would see the ENT specialist and she retorted that she did not know whether the blue plastic pieces in Plaintiff's nose were stents or technically described by another term.

On February 10, 2003, over a month after his surgery, Plaintiff was transported to see the ENT specialist who performed his surgery, James E. Blaugrund, M.D. Upon examination, Plaintiff was asked why he had not returned within 7 - 10 days to have the stents removed. Plaintiff stated that that question should be addressed to Ms. Joan Delie. The doctor told him that his stents should have come out within 7 - 10 days and that he would experience a great improvement after they were removed. He proceeded to cut the sutures with some difficulty and pulled one three-inch stent out of each nostril. Plaintiff felt immediate relief and regained usage of his nose.

The facts recited above indicate that Plaintiff may be able to demonstrate that he was denied necessary treatment for non-medical reasons thereby evidencing deliberate indifference.

Delie was personally involved in the medical treatment Plaintiff received and had personal knowledge of Plaintiff's complaints. She met with Plaintiff several times to come up with an appropriate DTPP and was aware of Plaintiff's complaints that none of the treatment plans were providing him with any relief. Moreover, the record shows that Delie was aware of Plaintiff's degenerative disc condition and that two neurosurgeons saw the need for surgery to correct the problem; however, nothing was done in this regard.  What is unclear from the record is whether Delie had any ability or authority to influence the course of medical treatment Plaintiff received.  Deliberate indifference can be shown where prison authorities prevent an inmate from receiving a recommended treatment.  *See* Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979).

In addition, Plaintiff states that he did not receive his pain medications in a timely fashion at least seven times.  With respect to his nasal surgery, Plaintiff claims that Delie told him she thought the prison doctors could handle his post-operative care notwithstanding the surgeon's orders to see him in seven to ten days.  This decision resulted in delaying required medical treatment to Plaintiff and increased pain and suffering.

As stated above, a plaintiff can demonstrate "deliberate indifference" in a variety of circumstances, including where the defendant:  1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; 2) delays necessary medical treatment based on a non-medical reason; or 3) prevents

a prisoner from receiving needed or recommended medical treatment.  *See* Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993) (citation omitted).  Moreover, "[w]here prison authorities deny reasonable requests for medical treatment and such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury,' deliberate indifference is manifest.". Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987), *cert. denied*, 486 U.S. 1006 (1988).  The record evidence is sufficient to create a material question of fact concerning Defendant Delie's authority over and responsibility for Plaintiff's medical treatment.  Specifically, there appears to be a question of fact regarding whether the delays of recommended examinations and surgeries for Plaintiff's various conditions was the result of non-medical reasons such as cost and/or inadequate medical staffing and whether Delie had oversight responsibility to ensure that Plaintiff received adequate care.  Consequently, Defendant Delie has failed to demonstrate that she is entitled to summary judgment as a matter of law with respect to Plaintiff's claim for denial of adequate medical treatment.

### III. CONCLUSION

It is respectfully recommended that the Motion for Summary Judgment filed by Defendant Joan Delie (doc. no. 66) be denied and that the Plaintiff's "Counter" Motion for Summary Judgment (doc. no. 74) be denied.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (c), and Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

                s/Lisa Pupo Lenihan
                LISA PUPO LENIHAN
                UNITED STATES MAGISTRATE JUDGE

Dated: December 8, 2005


cc: Alan N. Bloch
    United States District Judge

    David J. Munchinski, AJ-0877
    SCI-Fayette
    50 Overlook Drive
    LaBelle, PA 15450-1050

    Patricia L. Dodge, Esquire
    Meyer, Unkovic & Scott LLP
    1300 Oliver Building
    Pittsburgh, PA 15222

    Elizabeth M. Yanelli, Esquire
    Pietrogallo, Bosick & Gordon
    One Oxford Centre, 38th Floor
    Pittsburgh, PA 15219

    Rodney M. Torbic
    Senior Deputy Attorney General
    Office of the Attorney General
    6th Floor, Manor Complex
    564 Forbes Avenue
    Pittsburgh, PA 15219