IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVID JOSEPH MUNCHINSKI,                    )
                                            )
                    Plaintiff,              )
                                            )
            vs.                             )      Civil Action No. 03-788
                                            )      Judge Alan N. Bloch
                                            )      Magistrate Judge Lenihan
WEXFORD HEALTH SERVICES, INC.;              )
EUGENE GINCHEREAU, M.D.,                     )
Medical Director; PAUL NOEL,                )
M.D., Wexford Regional Medical              )
Director for Western                        )
Pennsylvania; JOAN DELIE,                   )
Correctional Health Care                    )
Administrator; NEAL K.                      )
MECHLING, Facility Manager                  )
SCI-Pittsburgh; and PRISON                  )
HEALTH SERVICES INC.,                        )
                                            )
                    Defendants.             )


MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION


I. RECOMMENDATION

It is respectfully recommended that the Motion for Summary
Judgment filed by Defendants Prison Health Services, Inc. and
Paul Noel, M.D. (doc. no. 82) be granted, that the Joint Motion
for Summary Judgment filed by Defendants Wexford Health Services
Inc. and Eugene Ginchereau, M.D. (doc. no. 85) be granted and
that the Plaintiff's "Counter" Motion for Summary Judgment (doc.
no. 89) be denied.

II. REPORT

Plaintiff, David Joseph Munchinski, a prisoner previously
confined at the State Correctional Institution at Pittsburgh,
Pennsylvania (SCIP), commenced the present action pursuant to

1

the Civil Rights Act of 1871, 42 U.S.C. § 1983 against the following Defendants:  Wexford Health Sources, Inc. (WHS) (incorrectly identified in the Complaint as Wexford Health Services, Inc.); Eugene Ginchereau, M.D., Medical Director; Paul Noel, M.D., Wexford Regional Medical Director for Western Pennsylvania;  Joan Delie, Correctional Health Care Administrator; Neal K. Mechling, Facility Manager, SCIP; [1] and Prison Health Services, Inc. (PHS).  Plaintiff alleges that Defendants violated his rights as protected by the Eighth and Fourteenth Amendments of the United States Constitution as a result of alleged denial of adequate medical treatment he received while he was confined at SCIP.

### A. Standard of Review

Presently pending before the Court are motions for summary judgment filed by Defendants Dr. Noel and PHS (doc. no. 82) and Defendants Dr. Ginchereau and WHS (doc. no. 85), as well as Plaintiff's "counter" motion for summary judgment (doc. no. 89). Pursuant to Fed. Rule Civ. Proc. 56(c), summary judgment may be granted if, drawing all inferences in favor of the non-moving party, the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Summary judgment may be granted against a party who fails to adduce

---

[1]     Defendant Mechling no longer is a Defendant in this action, doc. no. 44.

facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986) (party can move for summary judgment by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case.").  The moving party bears the initial burden of identifying evidence that demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth ". . . specific facts showing that there is a  genuine issue for trial . . ." or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

## B. Relevant Material Facts

Plaintiff, a 51 year old male serving a life sentence, was incarcerated at SCIP from 1987 until December of 2003.  He complains that Defendants failed to provide him with adequate medical treatment with respect to several specific concerns during the time period from October of 2001 until he was transferred to the State Correctional Institution at Fayette, Pennsylvania in December of 2003.  Defendant Dr. Noel was the Medical Director at SCIP for Defendant PHS from May of 2001

until September 30, 2002.  On October 1, 2002, Defendant WHS became the medical care provider for SCIP until August 31, 2003. On September 1, 2003, PHS took over as medical care provider at SCIP.  Defendant Dr. Ginchereau was the Medical Director at SCIP from March 31, 2003 until January of 2005 when SCIP closed.

Plaintiff claims that his medical concerns resulted from spinal and nasal injuries he sustained in a motorcycle accident that occurred in 1977.  With respect to his back injury, he alleges that in the fall of 2001 he began experiencing increasing back and neck pain, a growing numbness in his right wrist, arthritic swelling of his right hand, and sharp pain at his right inner elbow when doing menial tasks such as pulling up his socks.  At that time, Plaintiff was seen by Dr. Noel who ordered x-rays of his right shoulder and cervical vertebrae. Compl. ¶ 11; Noel Aff. ¶ 15.  On December 26, 2001, Plaintiff filed an Inmate Request to Staff Member to Dr. Noel regarding the back pain.  When he failed to receive a response to his request, on January 18, 2002, Plaintiff filed Grievance No. 12304.  As a result, on March 5, 2002, Plaintiff met with Ms. Delie, Healthcare Administrator and Dr. Noel to decide upon an appropriate Diagnostic and Treatment Program Plan (DTPP) to address Plaintiff's medical conditions. After this meeting a variety of tests, including additional x-rays, were performed to diagnose the causes of Plaintiff's condition.  Dr. Noel also authorized an extra mattress for thirty days.  X-rays were taken on March 20, 2002: the x-ray of Plaintiff's right shoulder was

normal with no evidence of fracture or dislocation. Ex. G, doc. no. 82. The x-ray of Plaintiff's spine showed degenerative disc disease (DDD) and osteoarthritis. Plaintiff was given pain medication and ordered to follow up at the Medical Director Clinic for further evaluation. On April 15, 2002, at the Medical Director Clinic, Plaintiff was evaluated for complaints of neck pain and numbness. At that time, Dr. Noel ordered an MRI of Plaintiff's cervical spine as well as x-rays of his thoracic spine. In addition, Dr. Noel also authorized an extra mattress for one year and prescribed pain medication. On April 17, 2002, an x-ray of Plaintiff's spine showed "hypertrophic spurring."

By June of 2002, Plaintiff's daughter became concerned that Plaintiff was suffering from clinical depression and requested that Plaintiff be examined by a prison psychiatrist. Ms. Delie scheduled Plaintiff to see Dr. Kerns. Sometime in early July of 2002, Dr. Kerns examined Plaintiff and ordered an MRI test of Plaintiff's brain suspecting that he may have suffered a stroke.

The next medical record concerning Plaintiff's spinal issues is dated June 24, 2002. At that time, Plaintiff went to the Triage Unit (emergency room) at SCIP. The nurse on duty refused to admit Plaintiff because he had a "chronic" problem and not an emergency and asked him why he had not signed up for sick call. Progress Notes, Ex. B, doc. no. 82. She offered him Tylenol, which he refused. On June 25, 2002, Plaintiff sent a

request to Dr. Noel complaining that his scheduled MRI had not been performed and that he was in a great deal of pain. Subsequently, Plaintiff was seen on sick call and the narcotic drug Vicadin was prescribed for the pain.

On July 14, 2002, the MRI of Plaintiff's cervical vertebrae was performed.  Because Plaintiff became claustrophobic during the examination, he sent a request to Dr. Kerns on July 15, 2002 advising him that he could not submit to another closed MRI and requested that he cancel the brain MRI he had previously scheduled for his Parkinsonian symptoms.  On July 16, 2002, Dr. Noel changed Plaintiff's Vicoden medication orders, discontinued his Reglan medication, prescribed Valium and ordered Plaintiff to be checked at the next Medical Director's Clinic.  On August 1, 2002, Dr. Noel checked Plaintiff's pain medications and noted they were effective.  The progress notes indicate that the results of the MRI were not available to review at that time. Progress Notes, Ex. B, doc. no. 82.

On August 20, 2002, the results of the July 14, 2002 MRI showed that Plaintiff suffered from Degenerative Disc Disease (DDD), a herniated disc between vertebrae C2-C3, and a bulging disc between C7-T1.  Ex. F, MRI Report from Dr. Arthur J. Greene. At that time, Dr. Noel ordered that Plaintiff be examined by a neurosurgeon.  Consultation Record dated 8/20/02, Ex. F, doc. no. 82.

On September 13, 2002, Dr. Noel examined Plaintiff and noted there was no change in his symptoms and that they were

awaiting the neurosurgery consultation.  Dr. Noel ordered physical therapy until the consultation.  Plaintiff was provided with physical therapy and Progress Notes signed by Physical Therapist R.J. Capozzoli noted he experienced decreased pain afterward.  9/27/02 and 10/4/02, Ex. B.

On October 1, 2002, WHS became the new health care provider at SCIP.  Michele Hawkins took over as Medical Director and Dr. Noel became the Wexford Regional Medical Director for Western, Pennsylvania.  On October 18, 2002, Plaintiff met with Dr. Hawkins who told him that she would order a consultation with a neurosurgeon regarding his neck/arm condition, which continued to worsen.  On October 31, 2002, Plaintiff was seen by neurosurgeon Dr. Scott Baker who reviewed Plaintiff's x-rays and written MRI report excluding the MRI pictures.  Dr. Baker's report indicates that surgery is needed and that a full consultation would follow.  Ex. F, Consultation Report dated October 31, 2002, doc. no. 82.  The Report further indicates that he needed to review the MRI tape, which was not included in Plaintiff's records.

On November 3, 2002, Plaintiff sent a request to Ms. Delie asking her to send the MRI tape to Dr. Baker.  About a week later, at a subsequent sick call, Plaintiff learned that Dr. Baker no longer worked at WHS.  Plaintiff was told that he would see another neurologist soon.  On December 30, 2002, Plaintiff was seen by Neurologist David Oliver Smith, M.D.  Dr. Smith examined Plaintiff and concluded that he had Parkinsonism and a

"right radiculopathy possibly secondary to the right C-3-4 and C5-6 foraminal stenosis." He recommended that Plaintiff see another neurologist, Dr. Baser, for evaluation and treatment of his Parkinsonism before he treated his right cervical radiculopathy. Ex. E, pp. 68-69, doc. no. 88.

Dr. Ginchereau became the Medical Director at SCIP in March of 2003. Beginning shortly thereafter, he routinely ordered Plaintiff's narcotic pain medication every seven (7) days. On July 29, 2003, Plaintiff was examined by neurologist Susan Baser, M.D. who concluded that Plaintiff had Parkinson's disease, tremor predominant. Dr. Baser recommended treatment with the drug Sinemet. Her report indicates that she would like to obtain an MRI of Plaintiff's thoracic and lumbosacral spine. On July 30, 2003, Plaintiff first met with Dr. Ginchereau. At that time, Dr. Ginchereau examined Plaintiff and found no evidence of progressive neurological deficits. He concluded that there was no need for surgical or emergency intervention with respect to his back pain and prescribed Sinemet as recommended by Dr. Basir.

On July 31, 2003, Plaintiff wrote an Inmate's Request to Staff Member Dr. Ginchereau inquiring why he refused to approve the MRI request and would refuse to authorize surgery. On August 13, 2003 Dr. Ginchereau responded that Plaintiff would be re-evaluated by Dr. Smith.

On November 1, 2003, Dr. Ginchereau requested another neurological consult for Plaintiff. On November 12, 2003,

8

Plaintiff was seen by outside neurologist Joseph Wapenski, M.D., who examined Plaintiff and reviewed his MRI, x-rays and other studies that had been performed.  His report indicates that, although Plaintiff had degenerative changes in his cervical spine, he did not believe Plaintiff had a surgical issue at that point in time.  Ex. E, p.77., doc. no. 88.  Further, Dr. Wapinski examined his thoracic spine and found "no deformity of the spine, no specific focal injury, and no specific level of neurologic compromise referable to the thoracic spine."  *Id*. Further, Dr. Wapinski noted that he saw no specific clinical evidence that would direct him to identifying the presence of a lesion.  Finally, Dr. Wapinski made the following recommendation with respect to Plaintiff's back condition.

> 2.   Ay this time with regards to his cervical and thoracic spine, I find no particular specific cause for action other than the symptomatic treatment for degenerative arthritis.  I specifically do not see evidence of a surgical emergency.  I think that a second opinion from a neurosurgeon may be of some benefit.

Ex. E, p.78., doc. no. 88.

Dr. Ginchereau examined Plaintiff again on November 26, 2003 and found his neurological condition to be stable.  He also increased the dosage of his Parkinson's medication.  Plaintiff was transferred to SCI-Fayette in December of 2003.

Plaintiff also complains about medical treatment he received in regard to his nasal condition.  In his Material Facts in Support of Plaintiff (doc. no. 89), Plaintiff makes the following statement:  "It is not alleged that Dr Noel or PHS

were involved in Count II of the Complaint."  ¶8, doc. no. 89. Therefore, no facts pertaining to Defendants Noel and PHS are material or relevant as to this claim.  Moreover, Plaintiff's allegations concerning his nasal condition do not assert that Dr. Ginchereau had any involvement as to this claim.  Thus, the Court need only review material facts concerning this claim as they relate to the Motion for Summery Judgment by Defendant WHS.

Plaintiff suffers from chronic asthma, which has worsened with age.  Plaintiff was routinely treated at the Asthma Chronic Care Clinic at SCIP.  During a routine visit in early 2001, Dr. Flores referred Plaintiff to an ENT specialist relative to the nasal blockage.  On April 25, 2001, Plaintiff was examined by an ENT specialist who recommended surgery to correct the breathing problem.  Subsequently, Dr. Noel disapproved this "elective" surgical procedure.  Plaintiff grieved this denial at grievance no. 12302 and on May 29, 2002, received a recommendation from the Department of Corrections dated May 22, 2002 approving the surgery.

On December 9, 2002, Plaintiff was examined by ENT specialist James E. Blaugrund, M.D. who advised him that he would schedule his surgery and that he would be inserting stents during the surgical procedure that would be required to be removed within 7 - 10 days after surgery.  WHS approved the surgery and Plaintiff's nasal surgery was performed on January 6, 2002 at Mercy Hospital.  On February 10, 2003, over a month after his surgery, Plaintiff was transported to see Dr.

Blaugrund who proceeded to cut the sutures and pulled one three inch stent out of each nostril.  Plaintiff felt immediate relief and regained usage of his nose.

### C. Liability under 42 U.S.C. § 1983

Plaintiff asserts liability against Defendants pursuant to 42 U.S.C. § 1983.  In order to assert liability under 42 U.S.C. § 1983, a plaintiff must meet two threshold requirements.  He must allege:  1) that the alleged misconduct was committed by a person acting under color of state law; and 2) that as a result, he was deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States.  Parratt v. Taylor, 451 U.S. 527, 535 (1981), *overruled in part on other grounds*, Daniels v. Williams, 474 U.S. 327, 330-331 (1986).

Plaintiff asserts that Defendants have violated his rights as protected by the Eighth Amendment as applied to the states through the Fourteenth Amendment.  In order to make out a prima facie case that a prison official's actions violate the Eighth Amendment's prohibition against cruel and unusual punishment, an inmate must show two elements.  First, a prisoner must show that the condition, either alone or in combination with other conditions, deprived him of "the minimal civilized measure of life's necessities," or at least a "single, identifiable human need."  Wilson v. Seiter, 501 U.S. 294 (1991) (citing Rhodes v. Chapman, 452 U.S. 337, 347 (1981)).  Second, an inmate must demonstrate deliberate indifference to prison conditions on the part of prison officials.  Farmer v. Brennan, 511 U.S. 825, 834

(1994); <u>Wilson</u>, 501 U.S. at 297; <u>Rhodes</u>, 452 U.S. at 347. "[O]nly the unnecessary and wanton infliction of pain implicates the Eighth Amendment. . . .   To violate the Cruel and Unusual Punishments Clause, a prison official must have a 'sufficiently culpable state of mind.'"   <u>Farmer</u>, 511 U.S. at 834 (quoting <u>Wilson</u>, 501 U.S. at 297).

In the context of a claimed denial of medical treatment, an inmate must show two elements to demonstrate a violation of his rights as protected by the Eighth Amendment:   1) that he was suffering from a "serious" medical need; and 2) that the prison officials were "deliberately indifferent" to the serious medical need.   *Id*.   The first element requires a plaintiff to demonstrate a medical need that is <u>objectively</u> "sufficiently serious."   A medical need is "serious" if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person easily would recognize the necessity for a doctor's attention.   <u>Monmouth County Correctional Institutional Inmates v. Lanzaro</u>, 834 F.2d 326, 347 (3d Cir. 1987), *cert. denied*, 486 U.S. 1006 (1988).

The second element requires a plaintiff to demonstrate that officials <u>subjectively</u> acted with a sufficiently culpable state of mind.   In this regard, a plaintiff must demonstrate that a defendant's acts constituted "an unnecessary and wanton infliction of pain" or were "repugnant to the conscience of mankind."   <u>Estelle v. Gamble</u>, 429 U.S. 97, 105-06 (1976).   With respect to claims for inadequate medical treatment, defendants

12

may exhibit deliberate indifference by intentionally denying or delaying access to medical care, or by intentionally interfering with the treatment once prescribed. *Id.* However, an inadvertent failure to provide adequate medical care does not evidence deliberate indifference. *Id.* Furthermore, while an intentional refusal to provide <u>any</u> medical treatment to an inmate suffering from a serious medical need manifests deliberate indifference and is actionable under the Eighth Amendment, the Eighth Amendment does not require that a prisoner receive every medical treatment that he requests or that is available elsewhere. A disagreement as to the appropriate choice of medical treatment does not give rise to a constitutional violation; the right to be free from cruel and unusual punishment does not include the right to the treatment of one's choice. <u>Young v. Quinlan</u>, 960 F.2d 351, 358 n.18 (3d Cir. 1992) (an inmate's disagreement with prison personnel over the exercise of medical judgment does not state a claim for relief under section 1983); <u>White v. Napoleon</u>, 897 F.2d 103, 110 (3d Cir. 1990). When, however, prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need for such treatment, the constitutional standard of <u>Estelle</u> has been violated. <u>West v. Keve</u>, 571 F.2d 158, 162 (3d Cir. 1978).

1. <u>Dr. Noel</u>

Here, the record evidence shows that Plaintiff received constant medical care for his complaints from Dr. Noel. Specifically, on October 16, 2001, Dr. Noel ordered x-rays of right shoulder and cervical vertebrae shortly after Plaintiff first began complaining about his condition.  On March 5, 2002, Plaintiff met with Ms. Delie, Healthcare Administrator and Dr. Noel to decide upon an appropriate Diagnostic and Treatment Program Plan (DTPP) to address Plaintiff's medical conditions. After this meeting a variety of tests, including additional x-rays, were performed to diagnose the causes of Plaintiff's condition.  Dr. Noel also authorized an extra mattress for thirty days.  Plaintiff was given pain medication and ordered to follow up at the Medical Director Clinic for further evaluation. On April 15, 2002, at the Medical Director Clinic, Plaintiff was evaluated for complaints of neck pain and numbness.  At that time, Dr. Noel ordered an MRI of Plaintiff's cervical spine as well as x-rays of his thoracic spine.  In addition, Dr. Noel also authorized an extra mattress for one year and prescribed pain medication.  Plaintiff continued to receive pain medications and on July 14, 2002, the MRI of Plaintiff's cervical vertebrae was performed.  On July 16, 2002, Dr. Noel changed Plaintiff's Vicoden medication orders, discontinued his Reglan medication, prescribed Valium and ordered Plaintiff to be checked at the next medical Director's Clinic.

On August 1, 2002, Dr. Noel checked Plaintiff's pain medications and noted they were effective.  The progress notes

indicate that the results of the MRI were not available to review at that time.   On August 20, 2002, the results of the July 14, 2002 MRI showed that Plaintiff suffered from Degenerative Disc Disease (DDD), a herniated disc between vertebrae C2-C3, and a bulging disc between C7-T1.   At that time, Dr. Noel ordered that Plaintiff be examined by a neurosurgeon.   On September 13, 2002, Dr. Noel examined Plaintiff and noted there was no change in his symptoms and that they were awaiting the neurosurgery consult.   Dr. Noel ordered physical therapy until the consult.   Plaintiff was provided with physical therapy and Progress Notes signed by Physical Therapist R.J. Capozzoli noted he experienced decreased pain afterward. On October 1, 2002, WHS became the new health care provider at SCIP and Dr. Michele Hawkins took over as Medical Director at SCIP.

Construing the material facts in his favor, Plaintiff fails to show that Dr. Noel acted with deliberate indifference.   On these facts, no reasonable jury could conclude that Defendant Noel was deliberately indifferent to his needs or that he consciously disregarded a substantial risk of serious harm.   The record is clear that Dr. Noel vigorously treated Plaintiff for his medical condition.   Accordingly,  the Motion for Summary Judgment filed by Defendant Dr. Noel should be granted. *Accord* Young v. Quinlan, 960 at 358 (3d Cir. 1992) (district court properly granted summary judgment where no rational trier of fact could reasonably conclude that the defendants were

deliberately indifferent to plaintiff's medical needs); <u>Torraco v. Maloney</u>, 923 F.2d 231, 234 (1st Cir. 1991) (where there is no evidence of treatment so inadequate as to shock the conscience, let alone that any deficiency was intentional or evidence of acts or omissions so dangerous that a defendant's knowledge of a large risk can be inferred, summary judgment is appropriate).

2. <u>Defendant Dr. Ginchereau</u>

Dr. Ginchereau was the Medical Director at SCIP from March 31, 2003 until January of 2005 when SCIP closed. Dr. Ginchereau routinely ordered Plaintiff's narcotic pain medication although he did not personally examine Plaintiff until July 30, 2003. At that time, Dr. Ginchereau examined Plaintiff and found no evidence of progressive neurological deficits. He concluded that there was no need for surgical or emergency intervention with respect to his back pain and prescribed Sinemet as recommended by Dr. Basir. On August 13, 2003 Dr. Ginchereau responded to Plaintiff's inmate request that he would be re-evaluated by Dr. Smith.

On November 1, 2003, Dr. Ginchereau requested another neurological consult for Plaintiff. On November 12, 2003, Plaintiff was seen by outside neurologist Joseph Wapenski, M.D., who examined Plaintiff and reviewed his MRI, x-rays and other studies that had been performed. His report indicates that, although Plaintiff had degenerative changes in his cervical spine, he did not believe Plaintiff had a surgical issue at that point in time  Dr. Ginchereau examined Plaintiff again on

16

November 26, 2003 and found his neurological condition to be stable.   He also increased the dosage of his Parkinson's medication.   Plaintiff was transferred to SCI-Fayette in December of 2003.

Again, these facts do not indicate deliberate indifference by Dr. Ginchereau.   There is no indication, other than Plaintiff's bald unsupported statement, that Dr. Ginchereau delayed treatment or disregarded specific treatment recommended by the specialists who examined Plaintiff.   Here, after Dr. Ginchereau became Medical Director, Plaintiff was examined by two neurologists, neither of whom recommended surgery for Plaintiff's degenerative disc disease.   Although Dr. Baker recommended surgery in October of 2002, subsequent examinations by Drs. Smith, Basir and Wapinski did not recommend surgical treatment. At best, this evidence demonstrates a difference in medical opinion which is insufficient, as a matter of law, to establish deliberate indifference.   <u>White v. Napoleon</u>, 897 F.2d 103, 110 (3d Cir. 1990) ("If a plaintiff's disagreement with a doctor's professional judgment does not state a violation of the Eighth Amendment, then certainly no claim is stated when a doctor disagrees with the professional judgment of another doctor.").   When a medical professional simply chooses between two equally appropriate forms of treatment, there is no constitutional violation even though the prisoner may not agree with or be displeased by the doctor's course of action. Likewise, a disagreement between two physicians over the proper

17

course of treatment does not give rise to a constitutional violation since there may· be several acceptable ways to treat an illness. *Id*. (citations omitted). *See also* <u>Jackson v. McIntosh</u>, 90 F.3d 330, 332 (9th Cir. 1996). Consequently, Dr. Ginchereau's actions in failing to approve back surgery do not support any inference of deliberate indifference. *Accord* <u>Perez v. Sullivan</u>, 52 Fed. Appx. 275, 276 (7th Cir. 2002) (holding that corrections officials' refusal to authorize back surgery for inmate did not rise to level of Eighth Amendment violation where two physicians offered differing opinions regarding inmate's condition and necessity for surgery); <u>Whalen v. Correctional Medical Servs., et al.</u>, 2003 WL 21994752, *2 (D. Del. Aug. 18, 2003) (holding that Plaintiff's allegations regarding the decision not to perform back surgery did not state a claim of deliberate indifference).

Therefore,summary judgment should be granted as to Defendant Dr. Ginchereau because Plaintiff did not raise a genuine issue of material fact as to whether he acted with deliberate indifference in failing to approve back surgery. At best, Plaintiff presented evidence demonstrating a difference in medical opinion which does not establish deliberate indifference.

### 3. <u>Defendants PHS and WHS</u>

In order to assert a claim against PHS or WHS, Plaintiff must show that a constitutional deprivation resulted from an official custom or policy. <u>Pembaur v. City of Cincinnati</u>, 475

18

U.S. 469, 480-81 (1986).  Here, Plaintiff alleges that PHS and WHS had a policy or custom of providing inadequate care in an effort to maximize their profits.  Specifically, he alleges that these health care providers maintained a policy or custom of denying or postponing recommended treatment during the final months of their contracts in an effort to maximize their profits.  In addition, he alleges that these providers had a custom or policy of denying recommended surgical procedures on the basis that they were considered "elective" procedures.  The record shows otherwise.

Plaintiff has not demonstrated the existence of any policy or custom of PHS or WHS that led the medical staff to deprive him of necessary medical care.  To state a claim, Plaintiff would have to demonstrate that PHS or WHS has a policy or custom of not providing necessary medical care to inmates.  Thus, even if the surgery was medically necessary and the treating physician failed to provide it, PHS and WHS would not be liable unless it had policy or custom that encouraged or otherwise caused its physicians to not provide such necessary services.  Here, the record reflects that Plaintiff received constant treatment for his back pain, although not the treatment he deemed most appropriate.

Specifically, Plaintiff received at least four x-rays from October 16, 2001 and an MRI, which was performed during the final months of the PHS contract.  After the MRI results were in, Dr. Noel approved a neurological consult on August 20, 2002,

a month before the PHS contract expired.  During the PHS contract, Plaintiff consistently received pain medication and medical review of his spinal condition.

When WHS took over in October of 2002, Plaintiff received three outside neurological consultations with Drs. Baker, Smith and Basir.  He also continued to receive his pain medications and received continual monitoring of his condition.  When PHS again took over the contract at SCIP, Plaintiff was approved to see yet another neurologist, Dr. Wapinski, who reported that he did not see any surgical issue at that point in time.  Plaintiff was transferred to SCI-Fayette shortly thereafter.

The decision not to operate is not a policy or custom, but merely a disagreement over the course of medical treatment which does not rise to a constitutional issue.  *See* <u>Key v. Brewington-Carr</u>, 2000 WL 1346688, at *11 (D. Del. Sept. 6, 2000).  Here, Plaintiff has not set forth any evidence to show that there is a disputed fact over whether PHS or WHS failed to approve necessary medical treatment.  Consequently, the motions for summary judgment filed by Defendants PHS and WHS should be granted.

Plaintiff filed an untimely "counter motion for summary judgment" on July 21, 2005. This motion appears to be a response to the pending motion for summary judgment filed by Defendants herein, but also requests that summary judgment be granted in his favor as to Defendant Joan Delie. Plaintiff has not demonstrated that he is entitled to summary judgment as a matter

of law as to the remaining Defendant Joan Delie, Correctional Health Care Administrator. Thus, his counter motion for summary judgment should be denied.

### III. <u>CONCLUSION</u>

It is respectfully recommended that the Motion for Summary Judgment filed by Defendants Prison Health Services, Inc. and Paul Noel, M.D. (doc. no. 82) be granted, that the Joint Motion for Summary Judgment filed by Defendants Wexford Health Services Inc. and Eugene Ginchereau, M.D. (doc. no. 85) be granted and that the Plaintiff's "Counter" Motion for Summary Judgment (doc. no. 89) be denied.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (c), and Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

   s/Lisa Pupo Lenihan    
LISA PUPO LENIHAN
UNITED STATES MAGISTRATE JUDGE

Dated: March 2, 2006

```
cc:  Alan N. Bloch
     United States District Judge

     David J. Munchinski, AJ-0877
     SCI-Fayette
     50 Overlook Drive
     LaBelle, PA 15450-1050

     Patricia L. Dodge, Esquire
     Meyer, Unkovic & Scott LLP
     1300 Oliver Building
     Pittsburgh, PA 15222

     Elizabeth M. Yanelli, Esquire
     Pietrogallo, Bosick & Gordon
     One Oxford Centre, 38th Floor
     Pittsburgh, PA 15219

     Rodney M. Torbic
     Senior Deputy Attorney General
     Office of the Attorney General
     6th Floor, Manor Complex
     564 Forbes Avenue
     Pittsburgh, PA 15219
```